UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | No. 24 CR 142 |
| v. | |
| MICHAEL BENTLEY | Judge Jeffrey I. Cummings |

**GOVERNMENT'S POSITION PAPER AS TO SENTENCING FACTORS**

The UNITED STATES OF AMERICA, by its attorney, ANDREW S. BOUTROS, United States Attorney for the Northern District of Illinois, hereby submits its position paper as to sentencing factors. In consideration of the advisory Guideline range and statutory sentencing factors, the government recommends that the Court impose a below-Guideline sentence of 91 months of imprisonment.

## I. DEFENDANT'S NARCOTICS TRAFFICKING OFFENSES

Beginning in or around April 2017, law enforcement officials ("LEOs") identified suspicious parcels mailed from the Chicago area. Through search warrants, physical surveillance, and controlled purchases, the USPIS identified that defendant Michael Bentley distributed narcotics to customers located across the United States through a dark web store named ALLGOLDEVERYTHING (the "Store").

As described in the Plea Agreement,[1] defendant participated in the Store's operations from approximately August 1, 2017, through February 18, 2020, the date

---

[1] At the September 23, 2025, change of plea hearing, the Court deferred acceptance of the Plea Agreement until sentencing, and it has not yet been filed on the docket. Dkt. 32.

LEOs executed a search warrant at his residence and effectively shut down the Store. From the start of his involvement, defendant assumed substantial roles in the Store's operations. He manufactured crack cocaine, used his personal connections to obtain heroin and powder cocaine, and delivered the narcotics-laden parcels to the post offices. By approximately January 2020, a person identified in the Plea Agreement as Individual A stopped working with the Store, and defendant assumed full control of the operations, which included maintaining the Store's online presence, procuring the drugs, setting the drug prices, and weighing, packaging, and mailing the drugs.

The Store operated on dark web marketplaces hidden from customary online searches. Access to dark web stores, which typically specialize in selling illicit items, require a special browser to avoid detection from law enforcement. As illustrated in the screenshot below, the Store had its own vendor page with glossy advertisements of the controlled substances offered for sale. Customers added the narcotic of their choice to a check-out basket, paying by cryptocurrency.



The Store displayed a photograph of the heroin, along with a product description. The Store's webpages also incorporated photo arrays to allow a customer to readily compare the various drug offerings:



To distinguish itself, the Store used different styles of packaging as a "branding" exercise. On occasion, defendant placed the narcotics in a gold-colored mylar pouch enclosed in a "thank you" card, as shown below.



Defendant acknowledged attempting to distribute the following eight parcels of narcotics, as charged in Counts 1 through 8 of the indictment:[2]

| COUNT OF INDICTMENT | DATE | CONTROLLED SUBSTANCE | QUANTITY |
|---|---|---|---|
| 1 | May 14, 2019 | Cocaine Base | .96 grams |
| 2 | November 6, 2019 | Heroin | 3.9 grams |
| 3 | December 12, 2019 | Cocaine | .98 grams |
| 4 | December 16, 2019 | Heroin Cocaine | 15.9 grams .97 grams |
| 5 | January 7, 2020 | Heroin Cocaine | .97 grams 6.5 grams |
| 6 | January 20, 2020 | Heroin Cocaine | 1 gram 1 gram |
| 7 | February 10, 2020 | Heroin Cocaine | 1.9 grams 10 grams |
| 8 | February 14, 2020 | Heroin | 3 grams |

Count 9, the offense of conviction, charges defendant with possessing with intent to distribute the heroin, powder cocaine, and cocaine base that LEOs seized from his residence on February 18, 2020. LEOs seized approximately 90 grams of heroin, 24 grams of cocaine base, 77 grams of cocaine, and 15.5 grams of MDMA. In addition, according to defendant's computer records, over the span of January 9, 2020, through February 17, 2020, the Store filled 279 individual heroin orders plus additional orders for cocaine. Defendant agrees that he is accountable at sentencing for approximately 5,261 grams of heroin, 7,511 grams of cocaine, 480 grams of cocaine base, and 18.5 grams of MDMA. *See* Plea Agreement, p. 6; PSR, ¶¶ 4, 12, 32.

---

[2] A factual summary for each mailing is in the Government's Version of the Offense ("GVO"), pp. 3-5.

4

## II. MAXIMUM PENALTIES

Count 9 carries the following maximum penalties:

- Maximum sentence of 20 years of imprisonment. PSR, ¶ 105.

- Maximum fine of $1,000,000. PSR, ¶ 120.

- Term of supervised release of at least three years, and up to any number of years, including life. PSR, ¶ 108.

- $100 special assessment. PSR, ¶ 113.

## III. ADVISORY GUIDELINE RANGE

The government agrees with the advisory Guideline range identified by the Probation Office. PSR, ¶ 106. Defendant has a total adjusted offense level of 33 and a criminal history category of I, producing an advisory range of 135 to 168 months of imprisonment. *Id.* Defendant does not appear to dispute the Probation Office's calculation of the range.

## IV. SECTION § 3553(a) FACTORS

### A. Circumstances of the Offense

Defendant unquestionably distributed substantial quantities of dangerous street drugs, including over 5.2 kilograms of heroin and 7.5 kilograms of cocaine. Defendant also took the additional step of personally manufacturing crack cocaine, ultimately distributing at least 480 grams of cocaine base.

Defendant's offense conduct did not occur in a vacuum. He began selling drugs after high school, starting with marijuana. GVO, Exhibit A, p. 3. In approximately 2011 or 2012, after leaving college, defendant began selling approximately 3 to 5

grams of cocaine to customers each week. *Id.* Individual A, after learning of defendant's connections to drug suppliers, invited defendant to participate in the Store's operations. *Id.* at 4 (stating, "When I met [Individual A], I had sold drugs for quite a while and knew sources of heroin," and Individual A "had some discrepancies with his previous drug suppliers and was looking for a new avenue to obtain narcotics"). Defendant's offense was not a one-time temptation or lapse, but the culmination of over 9 years of drug trafficking conduct, which defendant sharply escalated through his operation of the Store.

As defendant correctly recognizes, he had other choices. Despite the feeling of loss defendant felt through his sister's and mother's health issues and disciplinary problems at a younger age, he thrived at an academically acclaimed Chicago high school.[3] After graduating high school, defendant attended college, did well academically, and came close to completing a degree. Defendant had a documented record of accomplishment and achievement before he committed the offense, and, unlike others who appear before the Court, was not driven to traffic drugs through any combination of a lack of education or the ability to sustain lawful employment. Nor was defendant indoctrinated into drug trafficking by family members, through immersion in street gangs, or because he was abandoned by family such that he needed to sell drugs to survive. This crime was a choice defendant made, well into

---

[3]     Defendant also describes that he was the victim of a carjacking offense at age 17. Def.'s Br, p. 7. The government agrees that this violent crime was abhorrent and traumatic. Defendant stated that he does not need mental health treatment (PSR, ¶ 72), and the carjacking was not reported to have influenced his decision to commit the instant drug trafficking offense.

adulthood, to personally profit from the drug trade and the addictions of his customers.

The Store's business was robust, completing literally thousands of individual drug transactions. Defendant described that he earned an average profit of between $1,500 and $2,000 a week while splitting the Store's proceeds with Individual A. GVO, Exhibit A, p. 10.  He later took complete control of the Store, setting the prices and keeping 100% of the profits. Any suggestion that defendant did not financially benefit from the offense is inconsistent with his prior statements,[4] and the drug debts defendant described to LEOs were incurred in late 2019, not long before LEOs shut down the Store. *See id.* at 17. Defendant also did not identify for the Probation Office any other source of income that could conceivably have supported his lifestyle, which included an apartment rented in Streeterville for $2,991 per month and a Mercedes. Defendant made money from this offense, and he would have continued selling the drugs in the absence of law enforcement intervention in this case.

The substances were dangerous. Defendant trafficked in potent street drugs that, absent effective treatment and intervention, has led to thousands of heroin[5] and cocaine[6] overdose deaths. The organization and structure of the Store maximized the

---

[4]     *Cf.* Def.'s Br., p. 25 (referencing that he perpetuated the offense he was underwater financially with drug debts). Further, there were no reports of anyone threatening defendant into selling drugs for a living. *Cf.* Def.'s Br., p. 25 (stating that he wanted to stop operating the Store but drug suppliers "would not take no for an answer").

[5]     https://nida.nih.gov/research-topics/trends-statistics/overdose-death-rates#Fig5 (last visited February 3, 2026).

[6]     https://www.cdc.gov/nchs/products/databriefs/db522.htm (last visited February 3, 2026).

quantity of narcotics defendant distributed and expanded his customer base nationwide. It would have been very difficult for an addicted customer to resist the temptation to make a purchase, once the customer encountered the Store and others like it. Customers could readily enter search queries for illicit products, buy the drugs, and arrange to have them shipped to their doors within minutes. Individuals did not need to find local narcotics dealers or meet them in person, exposing users to additional safety hazards and increasing the risk of law enforcement detection.

All it took was a few clicks to get the drugs. Over time, the number of customer reviews for the Store on the Dream Market skyrocketed to 5,400 individual reviews:



In addition, as of January 20, 2020, the Store had 622 customer reviews posted to a second dark web marketplace named Empire Market:



The number of drug transactions defendant accomplished is staggering, exceeding any quantity he could have sold through individual hand-to-hand transactions in the local Chicago area. In total, defendant distributed over 5.2 kilograms of heroin, 7.5 kilograms of cocaine, and 480 grams of cocaine base, aggregate drug quantities that far exceed what would require a 10-year mandatory minimum sentence in applicable cases. 21 U.S.C. § 841(b)(1)(A) (identifying drug quantity thresholds of 1 kilogram of heroin, 5 kilograms of cocaine, and 280 grams of cocaine base).[7]  Moreover, defendant was not a low-level actor or street seller who reported to a hierarchy of people. He was the drug source for the Store, supporting its operations, and after Individual A departed, he did it all – procuring the drugs, advertising the narcotics, sending the parcels, and reaping all the profits.

---

[7]     Defendant was not charged with those mandatory minimum drug quantities, and the government makes this argument by analogy to describe the seriousness of the offense and relevant conduct.

Apart from the drug trafficking conduct, which was substantial, it is an additional aggravating factor that defendant possessed two firearms inside the Murano vehicle he used to transport narcotics. One loaded pistol was stored inside the driver's side door, and a Magnum shotgun was kept in the back seat.



Defendant was not licensed to possess those guns. GVO, Exhibit A, p. 18. "[W]eapons are 'tools of the [drug] trade,'" *United States v. Cooper*, 19 F.3d 1154, 1163 (7th Cir. 1994) (citation omitted), and the Probation Office correctly highlighted the needless risk that defendant posed to public safety through his possession of the firearms.

### B.      Other Personal Characteristics and Sentencing Factors

As described in the PSR, defendant had the benefit of two supportive parents, a sibling, as well as extended family, and he was capable of legitimate employment. Nothing forced defendant to choose a path of dark web drug sales.

In assessing the Section 3553(a) sentencing factors, the government recommends a sentence of 91 months. The government's recommendation considers the assistance he offered during law enforcement's investigation (*see* GVO, pp. 6-7),

and defendant's rehabilitation and good conduct since law enforcement's February 18, 2020, disruption of the Store. Defendant knew, during the time that elapsed between the February 2020 residential search and the indictment filed in March 2024, that the government's investigation was ongoing, and he understood he needed to make different life choices or risk additional law enforcement attention. He successfully dedicated himself to making those changes, obtaining a CDL, securing employment, and assisting his family in multiple ways. Defendant has a wide support system including family, friends, co-workers, and members of the community who wrote letters on his behalf and expressed confidence that he will not again violate the law. The government commends defendant's rehabilitation and agrees that it is uniquely mitigating, warranting a below-Guideline sentence.

Defendant, alternatively, seeks a sentence of 24 months. His proposal, however, is too low under the statutory factors, considering the substantial multi-kilogram quantities of his drug trafficking activity, that he committed the crime despite having educational advantages and opportunity, and his role in supplying and managing the Store, leading to over 6,000 drug transactions and distributions of narcotics throughout the United States. He also possessed two firearms without a license inside the Murano vehicle, including a loaded weapon within his reach on the driver's side of the car. The government's recommended sentence of 91 months balances the totality of the Section 3533(a) factors, including the advisory Guideline

11

range, the seriousness of the offense, defendant's offense conduct, and the need for the Court to afford both adequate general and specific deterrence.[8]

## V.      SUPERVISED RELEASE

The government agrees with a three-year term of supervised release with the conditions recommended by the Probation Office.

### CONCLUSION

Accordingly, for the reasons set forth above, the government requests that this Court impose a below-Guideline of 91 months of imprisonment and a 3-year term of supervised release with conditions.

Respectfully submitted,

ANDREW S. BOUTROS
United States Attorney

By: *s/ Erin Kelly*
ERIN KELLY
Assistant United States Attorney
219 South Dearborn Street
Chicago, Illinois 60604
(312) 886-9083
erin.kelly@usdoj.gov

---

[8]      Although not cited by the government in aggravation, defendant asks that the Court strike the reference in Paragraph 43 of the PSR to a Florida case and a related Georgia arrest, stating that the person charged in the Florida case was not defendant. Def.'s Br., p. 31. Defendant did not deny in prior testimony that he was named as a defendant in the Florida case (*see* GVO, Exhibit A, p. 3). The government will wait to hear from the Probation Office before taking any position on the issue.